UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| ANGELA SCHNEIDER,<br>  Plaintiff,<br><br>V.<br><br>GP STRATEGIES CORP.,<br>  Defendant. | CIVIL ACTION NO. 5:15-331-KKC<br><br><br>OPINION & ORDER |

*** *** ***

This matter is before the Court on defendant GP Strategies Corporation's motion for summary judgment. (DE 22). For the following reasons, GP Strategies' motion is **GRANTED**.

## I. Background

Plaintiff Angela Schneider, a female, began working at GP Strategies in May 2014 in Madison County, Kentucky. From the record, it appears that GP Strategies contracted with Bechtel Corporation to provide technical and safety training for Bechtel's project to neutralize chemical weapons at the Bluegrass Army Depot[1] in Madison County. (DE 22-1, Memo. at 2).

Before her employment at GP Strategies, Schneider served as a nuclear mechanic in the U.S. Navy. At the project in Madison County, Schneider was a technical training specialist. In addition to her official job duties, Schneider volunteered on a project called the "Bluegrass Employees' Club," an employee incentive program meant to boost worker morale.

On September 3, 2014, Schneider learned of a workplace rumor circulating between GP Strategies lead training specialist Randy Maddox and office supervisor Doug Plummer that she was having a sexual relationship with married male coworker Covie Schmidt. The next

---

[1] The Court uses the spelling of the depot as it appears in the record.

day, Schneider confronted Maddox and Plummer about the rumor and requested a closed-door meeting with the two men and Schmidt. At the meeting, Schneider stated her belief that the rumor constituted sexual harassment and created a hostile work environment. She demanded the behavior stop immediately.

Schneider takes issue with several comments that were made before and during the meeting. First, Schneider represents that, just before the meeting, Maddox callously stated to her, "It's about time you put this rumor to bed." (DE 1-1, Complaint at 4). Schneider asserts that she felt this "purposeful double entendre" was meant to demean and humiliate her. (DE 1-1, Complaint at 4). Second, Schneider avers that, during the meeting, Plummer questioned why Schmidt was present, as the rumor could be seen as beneficial to Schmidt. Third, Plummer stated that it must be difficult for Schneider, as an attractive female, to work in a male-dominated environment. Schneider found this last comment to be inappropriate and argues that it furthered the hostile work environment.

During her meeting with the three men, Schneider expressed a desire to file a sexual harassment complaint, and after Schneider left the office, Plummer contacted GP Strategies' human resources department. As part of GP Strategies' investigation into Schneider's complaint, human resources employee Debra Temple spoke with Schneider. During their conversation, Schneider told Temple that she wanted the rumors to stop and that she was unsure why they were coming about. (DE 22-6, Temple Dep. at 3, internal page numbering at 15). Temple told Schneider that she would communicate with management and follow-up with Schneider.

Human resources then spoke with Dave Ziegler[2], a director within GP Strategies' homeland security operations group, and Plummer. During these discussions, Ziegler and

---

[2] Ziegler's name is spelled two different ways in the record. The Court will use the spelling as found in his deposition transcript.

Plummer indicated that someone may have overheard a conversation between them and that could have been the source of the rumor.[3] (DE 22-6, Temple Dep. at 3, internal page numbering at 16). GP Strategies counseled the two men that, given the makeup of the office, certain comments could be misinterpreted if overheard. (DE 22-6, Temple Dep. at 4, internal page numbering at 18).

After the discussions with the men in management, Temple tried to contact Schneider, but was unsuccessful. Schneider represents that she did receive an email from Temple asking when Temple could contact Schneider with the results of the investigation, but Schneider was also unable to reach Temple.

On September 11, 2014, Schmidt filed a separate complaint of sexual harassment.

In mid-September 2014, GP Strategies decided to hold an office-wide meeting to address workplace professionalism. During the meeting, Plummer distributed and reviewed a handout titled "Professional Standards & Expectations." One social expectation listed for employees was that they not be involved in gossip or spreading rumors. Neither Schneider nor Schmidt was mentioned by name during the meeting. Schneider argues that this meeting was sparsely attended.

Later in September 2014, Schneider complained to Ziegler that her work environment had gotten worse and that she did not think the sexual harassment had been addressed. Ziegler told her that he understood her complaint. He also told her that people were pleased with her work and that she had potential. (DE 23-6, Schneider Dep. at 51, internal page numbering at 159). On October 2, 2014, Schneider left a voicemail for Temple stating that Schneider's work environment had continued to deteriorate.

---

[3] GP Strategies argues that these statements would be hearsay if they were accepted for their truth. However, the Court is not considering these statements to demonstrate that Plummer and Ziegler were actually the source of the rumor.

3

Schneider claims that her work environment worsened after she filed her complaint, and specifically, after Schmidt filed his complaint. (DE 22-7, Schneider Dep. at 11, internal page numbering at 53). Schneider offers various examples of this hostility, including: comments by coworkers about being "best friends," which Schneider found to be mocking her relationship with Schmidt; comments by coworkers about remaining "professional," which she also found to be mocking; coworkers declining offers of her help; one coworker getting up and leaving the lunch table when she sat down, and the same coworker declining her offer to go play golf though he had previously gone with her; a rude comment by another coworker during a lunch break; Maddox not making eye-contact when Schneider asked permission to go work on the volunteer project; and someone printing out an office-wide email reminding employees not to work in the smoke area and placing it on her and Schmidt's desks. Schneider also alleges that one coworker stopped taking smoke breaks with her and another stopped eating lunch with her.

Schneider further claims that some employees were openly hostile to her, were unwilling to assist her with work or accompany her to the worksite, would stop talking when she approached, would walk slowly in front of her in the hall, and would stand aggressively toward her. (DE 22-2, Schneider Dep. at 29, internal page numbering at 96; DE 22-7, Schneider Dep. at 6, internal page numbering at 23). She also alleges that one coworker made a gun gesture toward her. (DE 22-7, Schneider Dep. at 6, internal page numbering at 23). These instances made Schneider dread her job, which she formerly had loved.

On October 2, 2014, Maddox and Schmidt had an altercation. The men were meeting with Plummer in Plummer's office in advance of another meeting to be held later that day, and Schmidt became agitated and started "baiting" Maddox. (DE 22-5, Plummer Dep. at 3, internal page numbering at 31–32). Maddox became upset and pushed Schmidt's chair across Plummer's office and stood up and got in Schmidt's face. Plummer ordered Maddox to leave

4

the office and then contacted security to have Maddox's badge disabled. The confrontation between Maddox and Schmidt continued after they left Plummer's office, and other coworkers, including Schneider, witnessed the men's ongoing actions.

During GP Strategies' investigation into what occurred, Schneider stated that she observed a portion of the events and that the confrontation became physical, with Maddox pushing Schmidt. At least one other witness stated that Maddox had invaded Schmidt's personal space and had used his body to force Schmidt to move in certain directions. (DE 23-4, Plaintiff's Exhibit 4 at 2). Other witnesses described a heated conflict, but did not mention any physical contact between the men.

Schneider claims that when she and Schmidt were leaving the office the day of the altercation between the men, they saw several employees in the parking lot and it seemed like those employees were waiting for her to walk to her car. Schneider found the actions of these employees—including one employee circling the parking lot before parking and waiving and smiling at them with a "very sinister smile" and employees making hand gestures at them to "beckon" them—to be threatening. (DE 22-2, Schneider Dep. at 56, internal page numbering at 186; DE 22-10, Thompson Dep. at 7–8, internal page numbering at 115–116).

Bechtel security conducted an independent investigation into the incident between Maddox and Schmidt, and Schneider provided a written statement to Bechtel's senior security specialist. However, Bechtel was unable to corroborate Schneider's allegations. Schneider and Schmidt also told Bechtel about the parking lot incident, but Bechtel was similarly unable to corroborate their allegations that other employees had beckoned them. (DE 22-10, Thompson Dep. at 7–8, internal page numbering at 115–116).

GP Strategies conducted its own investigation into what had occurred between Maddox and Schmidt. As part of that investigation, Ziegler and Temple held interviews with multiple employees, including Schneider. Ziegler and Temple did not find Schneider's testimony

5

believable based on its inconsistencies with other witnesses' testimony— particularly as to whether Maddox had physically assaulted Schmidt—and its own internal inconsistencies. (DE 22-1, Memo. at 10).

On October 10, 2014, GP Strategies terminated Schneider's employment. The company also terminated the employment of Maddox and Schmidt.

In her complaint, Schneider asserts four claims against GP Strategies: (1) discrimination based upon sex; (2) discrimination based upon gender; (3) retaliation in violation of Kentucky law; and (4) intentional infliction of emotional distress. Upon the close of discovery, GP Strategies moved for summary judgment on all of Schneider's claims.

## II. Analysis

### A. Standard of review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Moreover, entry of summary judgment is mandated, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

When, as here, a defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment; rather, the evidence should be viewed in the light most favorable to the non-moving party." *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 255). Based on this standard, "any direct evidence

6

offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).

## B. Schneider's claims

Schneider has brought each of her claims under Kentucky law. Her first three claims are based on alleged violations of the Kentucky Civil Rights Act. *See* KRS 344.010 *et seq.* Her final claim is based on Kentucky tort law.

### 1. Sex/gender discrimination based on a theory of harassment and a hostile work environment

The first two counts of Schneider's complaint assert that GP Strategies discriminated against her on the basis of her sex and her gender.[4] Here, Schneider contends that she was sexually harassed and that the discriminatory acts that she experienced "were so pervasive and severe that they created a hostile working environment in that [she] was continuously subjected to mental and physical trauma while at work." (DE 1-1, Complaint at 7). Schneider also represents that she was made fearful for her personal safety and employment status while at work because of the alleged discriminatory acts. (DE 1-1, Complaint at 7).

Schneider's discrimination claim is based on the Kentucky Civil Rights Act. *See* KRS 344.010 *et seq*. That law prohibits an employer from "discriminat[ing] against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex." KRS 344.040.

Claims brought under the Kentucky Civil Rights Act are analyzed in the same manner as those brought under Title VII, its federal counterpart. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) (citing *Ammerman v. Bd. of Educ. of Nicholas Cty.*, 30 S.W.3d 793, 797–98 (Ky. 2000)).

---

[4] Both of these counts assert the same cause of action, so they will be referred to as a single claim of sex/gender discrimination.

7

Title VII and the Kentucky Civil Rights Act prohibit two types of sexual harassment. *Gray v. Kenton Cty.*, 467 S.W.3d 801, 805 (Ky. Ct. App. 2014). The first category of prohibited behavior is quid pro quo harassment, "which occurs when an employee's submission to unwanted sexual advances becomes either a condition for the receipt of job benefits, or the means to avoid an adverse employment action." *Id.* (internal quotation marks omitted).

Second, a plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment. *Id.* Stated another way, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). Schneider proceeds under the second theory of sexual harassment.

To establish a prima facie case of a hostile work environment based on sex, a plaintiff must show that:

(1) she is a member of a protected class;

(2) she was subjected to unwelcome sexual harassment;

(3) the harassment was based on her sex;

(4) the harassment created a hostile work environment; and

(5) employer liability exists.

*Gray*, 467 S.W.3d at 805; *Nievaard v. City of Ann Arbor*, 124 F. App'x 948, 953 (6th Cir. 2005).

As a threshold matter, the parties do not dispute that Schneider is a member of a protected class in that she is female.

Next, Schneider must prove that she was subjected to unwelcome sexual harassment. On this element, courts have stressed that Title VII "is not intended to make all offensive conduct actionable." *Gray*, 467 S.W.3d at 805. Instead, as stated above, for sexual harassment to be

8

actionable, it must be sufficiently severe or pervasive to alter the conditions of the individual's employment and create an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

Here, Schneider argues that the rumor that she and Schmidt were having an improper relationship constitutes sexual harassment. However, "it is difficult to sustain a Title VII claim on the basis of a failure to quell rumors." *Birone v. Indian River Sch.*, 145 F.3d 1329 (unpublished table decision), available at No. 97-3212, 1998 WL 199791, at *4 (6th Cir. April 15, 1998).

Further, both Kentucky and federal courts have found idle gossip about an alleged office romance alone to be insufficient to support a hostile work environment claim. *Thompson v. Louisville Metro Gov't*, No. 2011-CA-001092-MR, 2013 WL 191878, at *3 (Ky. Ct. App. Jan. 18, 2013) (citing *Spain v. Gallegos*, 26 F.3d 439, 449 (3d Cir. 1994)); *Birone*, 1998 WL 199791, at *4 (citing *Spain*). While idle gossip can be hurtful, "standing alone it is difficult to impute liability to an employer for failing to suppress such rumors." *Birone*, 1998 WL 199791, at *4.

It is true that courts have found rumors to be actionable. For example, in *Spain*, the plaintiff's supervisor, a male, repeatedly and improperly requested that the plaintiff, a female, loan him money, and the recurring secret meetings between the two led other workers to believe they had a sexual relationship. 26 F.3d at 447. The Sixth Circuit's description of *Spain* is instructive:

> In that case, the Third Circuit allowed a claim based on workplace sexual rumors to survive summary judgment, but did so because the rumors were long-lasting, pervasive, directly affected the plaintiff's advancement, and, perhaps most importantly, were substantially caused and preserved by the plaintiff's supervisor, who was the person to whom she had to complain.

*Birone*, 1998 WL 199791, at *4.

9

Here, the Court can easily distinguish the rumor involving Schneider and Schmidt from the ones the Third Circuit found actionable in *Spain*. Although Schneider has put forth evidence that many employees had heard of the alleged relationship between Schneider and Schmidt, that is where the similarities between the instant rumor and the one in *Spain* end.

For one, the rumor in the present case did not last for years, or even months. Further, Schneider has not put forth any evidence that the rumor would affect her advancement. In fact, even after the rumor, Ziegler told Schneider that many at GP Strategies were impressed with her work and he discussed her potential with her. Additionally, although Schneider points to supervisors Plummer and Ziegler as being the source of the rumor, there is no evidence that these individuals preserved the rumors in the same way as the supervisor in *Spain*, whose continued behavior, including the improper solicitation of loans from the plaintiff, gave fodder to the rumors.

Thus, the Court finds the rumor involving Schneider and Schmidt to be idle gossip about an alleged office romance. As such, it cannot form the basis of Schneider's hostile work environment claim.

Additionally, the other actions that Schneider argues constitute sexual harassment—including that she was called a "bitch" on one occasion and that she experienced rudeness from her coworkers—are insufficient to sustain a hostile work environment claim. As courts have stressed, Title VII is not intended to be a general civility code. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

Perhaps more decisively, the rumor and other actions described by Schneider fail to satisfy the next element of her sexual harassment claim: that the harassment was based on her membership in a protected class, *i.e.*, her sex. Again, a plaintiff must always prove that the conduct at issue actually constituted discrimination *because of sex. See Oncale*, 523 U.S. at 81 (emphasis added).

10

In its motion for summary judgment, GP Strategies submits that Schneider cannot carry her burden on this element because Schmidt, a male, was also the subject of the rumor.

The Court agrees and finds that Schneider has not put forth evidence to support her argument that the rumor was directed at her *because* she was female. Notably, in her deposition, Schneider repeatedly referred to the rumor as affecting both her and Schmidt. Further, there is no suggestion that Schneider's coworkers thought she was using a sexual relationship with a superior as a means to get ahead in the workplace, which courts have found significant in allowing workplace rumors to be actionable. *See Spain*, 26 F.3d at 448.

Thus, the rumor currently before the Court does not have the characteristics recognized by the Sixth Circuit in *Birone* for what might constitute an actionable rumor. Indeed, instead of being "sufficiently slanderous, pervasive, narrowly targeted, and/or clearly tied to sex or race," *Birone*, 1998 WL 199791, at *4, this rumor was directed at both Schneider and Schmidt.

Moreover, the Supreme Court has "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *See Oncale*, 523 U.S. at 80. Instead, the critical issue, as indicated by Title VII's text, "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citing *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). Here, as GP Strategies argued in its memorandum, the hostility that Schneider and Schmidt suffered came from "equal-opportunity harassers." Thus, Schneider has not carried her burden on this element either.

Because Schneider has failed to meet the burden on two essential elements of her sexual harassment claim, GP Strategies is entitled to summary judgment and the Court does not need to reach the final elements of her claim.

### 2. Retaliation in violation of KRS 344.280

In the third count of her complaint, Schneider argues that GP Strategies retaliated against her in violation of KRS 344.280 after she complained about sexual harassment.

Schneider has not produced any direct evidence of retaliation by GP Strategies, so the Court will evaluate her claim using a burden-shifting framework. *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973)). Here, Schneider's burden will be to show that:

(1) she engaged in a protected activity;

(2) GP Strategies knew of her protected conduct;

(3) GP Strategies took an adverse employment action against her after her protected conduct; and

(4) there was a causal connection between the exercise of her protected right and the adverse employment action taken by GP Strategies.

*Id.*

If Schneider makes out this prima facie case, then the burden shifts to GP Strategies to produce a legitimate, non-retaliatory reason for its action. *Id.* If GP Strategies is able to provide such a reason, the burden shifts back to Schneider "to put forward competent evidence from which a reasonable jury could conclude that the stated reason is merely pretextual." *Id.* In other words, Schneider would attempt to show that the proffered reason was not the true reason for the employment decision. *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

At all times during this analysis, the ultimate burden of persuasion remains with the plaintiff. *Id.* (quoting *Burdine*, 450 U.S. at 253).

Under the burden-shifting framework, Schneider must initially show that she engaged in a protected activity that was known by GP Strategies. Schneider claims that making

complaints about sexual harassment and a hostile work environment constitute protected activity. The record is clear that GP Strategies knew about Schneider's complaints.

Under Title VII and the Kentucky Civil Rights Act, "an employee engages in protected activity when she opposes an unlawful employment practice." *Farmer v. Dixon Elec. Sys. & Contracting, Inc.*, Civil No. 10-326-ART, 2013 WL 2405547, at *6 (E.D. Ky. May 31, 2013). Here, Schneider, as plaintiff, must demonstrate that she had "a good-faith, reasonable belief that she was reporting unlawful sexual harassment." *Montell*, 757 F.3d at 505.

For purposes of discussion, the Court will assume that Schneider engaged in protected activity by complaining about what she perceived to be sexual harassment and a hostile work environment. *See Treaster v. Conestoga Wood Specialties, Corp.*, No. 4:09-CV-00632, 2010 WL 2606479, at *21 (M.D. Pa. April 29, 2010) (noting that because "rumors can amount to discrimination because of sex" the court could "not say as a matter of law or as a matter beyond factual dispute that the plaintiff's belief that she was complaining about sexual discrimination was not reasonable").

Next, Schneider must demonstrate that she was subjected to an adverse employment action and that a causal connection existed between that action and the protected activity in which she engaged. Schneider's arguments concerning incidents that constitute adverse employment actions can be separated into several groups: (1) GP Strategies' decision to prohibit employees from working outside; (2) hostile and unkind actions by her coworkers that Schneider alleges GP Strategies did not try to correct; and (3) her termination.

The Supreme Court has explained that Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Here, a plaintiff must show that a reasonable employee would have found the challenged action "materially

13

adverse," which means it might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. (internal quotation marks omitted).

Neither GP Strategies' decision to prohibit employees from working outside nor the actions by Schneider's coworkers fall into the category of activities that would dissuade a reasonable worker from making or supporting a charge of discrimination. However, being fired does. Thus, the Court must determine whether Schneider has alleged a causal connection between her complaints and her termination.

On this point, Schneider argues that the temporal proximity between her complaints and her termination is enough for the Court to find a causal connection. However, the Sixth Circuit has repeatedly cautioned against inferring causation based on temporal proximity alone. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471–72 (6th Cir. 2012). Further, an intervening legitimate reason for an employer's adverse action can dispel an inference of retaliation based on temporal proximity. *See id.* at 472.

This leads the Court to the next stage of the analysis: determining whether GP Strategies has put forth any legitimate, non-retaliatory reason for its decision to terminate Schneider's employment.

In its letter to Schneider, GP Strategies gave numerous explanations for ending her employment with the company. These reasons included that GP Strategies had found: Schneider to be "directly involved in multiple instances of provoking unprofessional behavior in other employees"; Schneider's behavior to be detrimental to the workplace; Schneider had made "unsubstantiated, provocative and defamatory allegations about co-workers"; Schneider's version of what transpired between Schmidt and Maddox contradicted other witnesses; and Schneider had taken "excessive unauthorized time away from work during normal working hours." (DE 1-1, Complaint at 14).

In her response to GP Strategies' motion for summary judgment, Schneider disputes the three reasons offered by GP Strategies in its motion for her termination: (1) that Schneider "appeared" to be untruthful in her account of the workplace violence; (2) that Schneider instigated problems in the office; and (3) that Schneider was spending a great deal of time away from the office.

Based on the justifications GP Strategies has provided, the Court finds that the company has carried its burden by demonstrating that it had numerous legitimate, non-retaliatory reasons for Schneider's discharge. Thus, the burden shifts back to Schneider to put forward evidence to show GP Strategies' reasons are pretextual.

A plaintiff can prove pretext by showing that the defendant's stated reason: (1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *Curtis v. Hanger Prosthetics & Orthotics, Inc.*, 101 F. App'x 61, 65 (6th Cir. 2004).

"The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.,* that they are 'factually false.'" *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167 (2009).

Under the second showing, Schneider would admit the factual basis underlying GP Strategies' proffered explanation and would further admit that such conduct could motivate dismissal. *Id.* Schneider would then attack the credibility of GP Strategies' reason indirectly by showing "circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id.* (emphasis in original).

Finally, Schneider could show attempt to show that other employees who engaged in substantially identical conduct were not fired. *See id.*

15

Here, Schneider has not put forth evidence to create a genuine issue of material fact as to whether GP Strategies proffered reasons were pretextual. Although Schneider attempts to challenge the underlying facts that lead to her discharge—namely, disputing whether she was truthful as to what occurred between Maddox and Schmidt and disputing that she instigated problems in the workplace—the Sixth Circuit "has adopted an 'honest belief' rule with regard to an employer's proffered reason for discharging an employee." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).

> Under this approach,
>
> as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied "on the particularized facts that were before it at the time the decision was made."

*Id.* (internal citations omitted).

Here, the record reflects a reasoned decision by GP Strategies to fire Schneider based on the information it had at the time it terminated her, as the investigation into the altercation between Maddox and Schmidt alerted the company to potential fabrication in Schneider's description of the events, her negative impact on the workplace, and her time away from the office during normal working hours. Further, GP Strategies terminated the employment of both Maddox and Schmidt.

In sum, Schneider has not put forth evidence that shows these reasons were merely a cover-up to retaliate against her for complaining about sexual harassment. *See Ky. Ctr. for the Arts v. Handley*, 827 S.W.2d 697, 701 (Ky. Ct. App. 1991) ("[I]f the employer articulates a legitimate, non-retaliatory reason for the decision, the employee must show that "but for" the protected activity, the adverse action would not have occurred."). As such, the Court will also grant summary judgment to GP Strategies' on this claim.

### 3. Intentional infliction of emotional distress

In the last count of her complaint, Schneider asserts a claim for intentional infliction of emotional distress. However, Schneider has conceded that this claim is preempted by her claim for emotional distress damages under the Kentucky Civil Rights Act. Thus, the Court will also grant summary judgment to GP Strategies on this count.

### C. GP Strategies' other requests for relief

In the event that the Court did not grant its motion for summary judgment, GP strategies asked for an order limiting the amount of damages that Schneider would be able to recover at a trial on her claims. As GP Strategies has been found to be not liable as a matter of law on each of Schneider's claims, the Court does not need to reach the company's alternative request.

### III. Conclusion

For the foregoing reasons, GP Strategies' motion for summary judgment on each of Schneider's claims is **GRANTED**.

Dated February 7, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY